UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MAN ZHANG and CHUNMAN ZHANG,
individually, and as ADMINISTRATORS of the
estate of ZHIQUAN ZHANG, deceased,

                          Plaintiff,

                                                                  17-cv-5415 (PKC)

          -against-

                                                          OPINION AND ORDER

THE CITY OF NEW YORK, et al.,

                          Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

          From April 2015, when Zhiquan Zhang was first detained at Rikers Island, the

medical staff at the facility treated Zhang for hypertension, hyperlipidemia, and lumbago,

prescribing medication for each of these conditions.  As he awaited trial over the next year,

Zhang had frequent interactions with the Rikers medical staff.  He complained to staff about pain

in his shoulder, back, and hand, and he experienced several incidents of chest pain.

          One of these incidents led to Rikers medical staff sending him to an off-site

hospital on September 5, 2015.  At the hospital, he was placed on a heart monitor and was found

to have a sinus rhythm consistent with his prior EKGs.  His cardiac enzymes were checked and

cleared, and a chest x-ray showed no ischemic changes.  The medical staff at the hospital

concluded that his condition did not require further hospitalization; he was discharged late that

evening and instructed to take aspirin and follow up with his physician.  He met with a nurse

practitioner upon his return to Rikers and had a follow-up visit on September 7.  He was

thereafter seen on multiple subsequent occasions by Rikers' medical staff, including being called

in for apparent non-compliance with his medications for hypertension and hyperlipidemia.  The records show that as of April 12, 2016, Zhang was picking up his prescription medications.

Unfortunately, on April 18, 2016, while still in custody, Zhang, age 61, was found in acute distress and efforts at CPR and resuscitation failed.  At autopsy, he was found to have died from hypertensive and atherosclerotic cardiovascular disease.

His sons Man Zhang and Chunman Zhang, individually, and as the administrators of his estate, filed the instant suit.  The Complaint originally brought numerous claims against several named and unnamed city officials, as well as against various municipal entities.  Now at summary judgment, the only remaining named defendants are the several municipal entities: the City of New York, the New York City Department of Correction ("NYDOC"), Rikers Island Facilities, New York City Health and Hospitals Corporation ("NYCHHC"), and Corizon Health, Inc. ("Corizon"), a city contractor (collectively the "Municipal Defendants").  The only remaining federal claim is a section 1983 claim for deliberate indifference to the medical needs of a pretrial detainee in violation of the Fourteenth Amendment.  Plaintiffs also have surviving state law claims for wrongful death, and negligence and medical malpractice.  Defendants have moved for summary judgment on all claims.

Long after fact and expert discovery had concluded, this action was reassigned to the undersigned.  (Minute Entry of 9/7/2022.)  As originally pleaded, plaintiffs' section 1983 claim was brought against both a group of unnamed individual defendants and the Municipal Defendants.  A municipal entity may only be held liable where it can be shown that a constitutional violation committed by individuals acting under color of state law is traceable to a municipal custom, policy, or practice.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690–91 (1978).  In recognition of this dependent theory of liability, discovery in

2

this case was bifurcated by Magistrate Judge Wang and discovery on the Monell claim was stayed "pending resolution of Plaintiffs' underlying claims."  (Opinion and Order of 6/5/2018 (ECF 118) at 1.)

Years went by and none of the "John and Jane Doe" defendants were named and joined as parties.  Almost four years after the close of all discovery on the underlying claims, and after the undersigned had set dates for final pretrial submissions and for the final pretrial conference (ECF 255), plaintiffs belatedly attempted to amend their complaint to name 32 individual defendants who had not been previously named or served.  The Court denied leave to amend for reasons explained.  (Opinion and Order of 12/22/2022 (ECF 273).)  Thus, there is no underlying claim against an individual actor to be resolved.

Under section 1983, plaintiffs are not required to assert a claim against an individual defendant, but they must nevertheless prove that one or more individuals acting under color of law deprived Zhang of a right protected by the Fourteenth Amendment.  If they do, then they may proceed against the municipal entity employing such actor or actors on a Monell theory of liability.  But in the absence of an underlying constitutional violation committed by someone acting under color of state law, plaintiffs may not proceed against the Municipal Defendants, the only remaining named defendants.

If, on this summary judgment record, a reasonable jury could find in plaintiffs' favor on an underlying constitutional violation—in this instance, deliberate indifference to a serious medical need of Zhang by someone operating under color of state law—then the stay of Monell discovery would be lifted, eventually leading to an adjudication of the Monell claim by trial or motion.  But, for reasons explained below, the Court concludes that no reasonable jury

could find in plaintiffs' favor on the underlying constitutional violation, and, therefore, the only federal claim, the Monell claim, will be dismissed.

Plaintiffs' stated theory of deliberate indifference is that the medical professionals treating Zhang at Rikers Island were aware of his risk factors for cardiac disease, but they intentionally or with culpable recklessness chose not to treat him when he complained of severe chest pain. But an examination of the summary judgment record shows that Zhang was being continuously treated for hypertension and hyperlipidemia—the conditions that were his identified cardiac risk factors. He twice complained of chest pain, and he received treatment on both occasions—in one instance, as noted above, he was transferred to a hospital but discharged by the hospital after testing. There is no evidence that any member of the Rikers medical staff consciously disregarded or avoided treating a serious medical condition of which he or she had knowledge or should have had knowledge.

The Second Circuit has made clear that a pretrial detainee's section 1983 claim may not proceed on a factual record that amounts to no more than negligence or medical malpractice. At most, that is all that appears on this summary judgment record.

In their opposition to summary judgment, plaintiffs for the first time argue that Zhang spoke the Wenzhou dialect of Chinese and that no interpreter was available who spoke this dialect. But in neither the Complaint nor in their two failed amendments do plaintiffs complain of any insurmountable language interpretation issues.[1] Any theory of liability on this basis fails because it has not been pleaded. Of equal importance, and as relevant to Zhang's

---

[1] In the Complaint, plaintiffs made a passing reference to a single instance in which Zhang complained through a fellow inmate who spoke Chinese. (ECF 1 at ¶ 76.) This caused Judge Keenan to note in his decision on the motion to dismiss that "[p]laintiffs' filings are silent as to Mr. Zhang's command of English." (Opinion and Order of 6/28/2018 (ECF 126) at 5 n.3.) As noted, plaintiffs subsequently submitted two proposed amended pleadings neither of which added allegations regarding language difficulties.

claim for deliberate indifference, the record shows that he appeared able to convey his basic symptoms to members of the medical staff through Mandarin interpreters, other detainees, or his own verbal or nonverbal communication.  No individual can be shown to be deliberately indifferent to his complaints and symptoms on this basis.

Because no reasonable jury could find in plaintiffs' favor on this record, the Court will grant the summary judgment motion on the section 1983 claim.  With no federal claims remaining, the Court will decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3).  This will not foreclose plaintiffs from refiling their claims in state court. The limitations period on their remaining state law claims—wrongful death and negligence and medical malpractice—has been tolled by this action and will be further tolled for a period of thirty days after their dismissal.  28 U.S.C. § 1367(d).

BACKGROUND

I.    Factual Background

On April 18, 2015, Zhiquan Zhang, age 60, was incarcerated at Rikers Island. (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.)[2]  He underwent an intake medical evaluation; the records of this evaluation reflect that his blood pressure was 143/75 and that he had a history of hypertension dating back to 2012.  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.)  Zhang was recorded as stating he had not taken blood pressure medication for three years and that that he did not have a history of heart disease.  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.)[3]

---

[2] Citations to the parties' Local Civil Rule 56.1 Statements are intended as a reference to the evidence cited in those statements.  Citation to exhibits in the summary judgment record is not intended to imply that the Court has relied exclusively on that portion of the record.

[3] In their Rule 56.1 Response and Counterstatement, plaintiffs repeatedly object to defendants' characterization of information contained Zhang's medical records.  Plaintiffs' position is that these records are, as a general matter, unreliable as to the actual state of Zhang's health and medical history because there was no interpreter present who spoke Zhang's dialect of Chinese.  For example, plaintiffs lodge the following objection to the records of Zhang's intake evaluation: "Plaintiffs dispute the foregoing to the extent of Mr. Zhang's medical history, consultation, and medication compliance not [being] assisted by a competent interpreter speaking Mr. Zhang's language and dialect."

The evaluating physician ordered a series of blood work, a chest x-ray, and an electrocardiogram ("EKG").  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.)  The results of the EKG showed "72/min sinus rhythm with first degree block, asymptomatic."  (ECF 284-5 at 118; Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.)  Zhang was prescribed Norvasc for his hypertension and referred to the dietary unit, and he was prescribed ibuprofen for lower back pain.  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.).  The results of Zhang's chest x-ray were normal.  (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.)  His cholesterol level was abnormal, and he was scheduled for a follow-up appointment to address this concern.  (Def. 56.1 ¶ 3; Pl. 56.1 Resp. ¶ 3.)

According to the records of the follow-up appointment on April 21, 2015, Zhang communicated that he had not taken his medication that day.  (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  He denied any "headache, dizziness, blurred vision, slurred speech, palpitation, chest pain, radiating pain, numbness and tingling sensations to face, neck and extremities."  (ECF 284-5 at 85; Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  Zhang was assessed as having hypertension and hyperlipidemia, and the records indicate that the nurse practitioner discussed lifestyle changes and emphasized the importance of taking his medication.  (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  He was prescribed aspirin for his hypertension in addition to Norvasc.  (ECF 284-5 at 85–88; Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  The record of this appointment does not indicate whether a Chinese interpreter was used.  (ECF 284-5 at 85–88; Pl. 56.1 ¶ 8; Def. 56.1 Resp. ¶ 8.)

On May 2, 2015, Zhang was again seen in the clinic because he had not picked up his medication from the pharmacy.  (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)  His blood pressure was

---

(Pl. 56.1 Resp. ¶ 2.)  The Court does not understand plaintiffs to dispute that these are in fact the contents of the records and the assessments of the medical personnel, but to instead dispute the ultimate accuracy of any medical information obtained through communications with Zhang.  Similarly, defendants repeatedly "dispute" additional facts offered by plaintiffs on the grounds that the lack of documentation of an interpreter does not necessarily mean no interpreter was used.  But defendants do not dispute the actual lack of documentation in particular instances.

recorded as 130/83, which was described as "ok," and Zhang was assessed as asymptomatic. (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)  The record also indicates that Zhang would "get norvasc soon."  (ECF 284-5 at 82.)  The record of this appointment does not indicate whether a Chinese interpreter was used.  (ECF 284-5 at 82–83; Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10.)

On June 9, 2015, medical personnel responded to an emergency call at Zhang's housing unit.  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.)  Zhang was observed walking towards the medical staff and did not appear to have labored breathing or other signs of distress.  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.)  He communicated to the responders that he had been experiencing left-side chest pain from front to back for the past few days, and he was transferred to the clinic for additional evaluation.  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.)

Records of this visit show that Zhang had been "voic[ing] pain" when breathing in for the past few days and that there was tenderness when pressure was applied to the left side of his chest.  (ECF 284-5 at 80; Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  Zhang's blood pressure was recorded as 133/85, which was described as normal, and he was given an EKG and chest x-ray. (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  The results of the EKG were also described as normal.  (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  Zhang was diagnosed with costochondritis—inflammation of the cartilage that joins the ribs and the breastbone—and pleuritis—inflammation of the pleura, the tissue that separates the lungs from the chest wall.  (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  He was given a "stat" dose of ibuprofen, which was administered in the clinic.  (ECF 284-5 at 79.)

Defendants' Inmate Death Review Annual Report later found that the "risk factors for coronary artery disease were not appropriately weighed" during this encounter; the report also noted the lack of documentation regarding the use of an interpreter.  (ECF 296-8 at 4; Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)

The next day, June 10, 2015, Zhang was seen for a follow-up appointment.  (Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  Zhang is recorded as reporting lower back pain but presenting no other complaints and showing no other signs of distress.  (Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  His blood pressure was recorded as 138/86; Zhang reportedly indicated to the treating physician that he had never taken the Norvasc he had been prescribed for hypertension, and the prescription was stopped.  (ECF 284-5 at 76–77; Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  Zhang was prescribed Zocor for his hyperlipidemia and ibuprofen for his back pain.  (ECF 284-5 at 76–77; Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  The record of this appointment does not indicate whether a Chinese interpreter was used.  (ECF 284-5 at 76–78.)

On June 12, 2015, Zhang's chest x-ray was returned as normal.  (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)

On July 6, 2015, Zhang was again seen for complaints of lower back pain.  (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.)  He exhibited a limited range of motion; it was recorded that he stated that the ibuprofen was only partially working, but—despite the assistance of a Chinese interpreter—he was unable to communicate what medication he had previously taken for his back pain prior to his detention at Rikers.  (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.)  He was prescribed Naprosyn and menthol-methyl salicylate ointment to apply to his back as needed.  (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.)  The physician did not document any review of Zhang's medical history.  (Pl. 56.1 ¶ 14; Def. 56.1 Resp. ¶ 14.)

Records show that Zhang refilled his aspirin prescription on July 20, 2015, and his Zocor prescription on August 10, 2015.  (Def. 56.1 ¶¶ 12–13; Pl. 56.1 Resp. ¶¶ 12–13.)

On September 5, 2015, medical personnel, including Dr. Muhammad Zaman, responded to an emergency call in Zhang's housing unit; upon arrival they found Zhang sitting in

a chair with a hand on the left side of his chest.  (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.)

Communicating through another inmate who spoke Chinese, Zhang reported that he had been

experiencing chest pain since the day before; the pain was not radiating, had no relation to his

breathing, and was lessened when he pressed on his chest wall.  (ECF 284-5 at 69; Def. 56.1 ¶

14; Pl. 56.1 Resp. ¶ 14.)  The inmate assisting with translation also communicated that Zhang

had a history of high blood pressure, but no cardiac conditions.  (ECF 284-5 at 69; Def. 56.1 ¶

14; Pl. 56.1 Resp. ¶ 14.)  Dr. Zaman assessed Zhang's vitals and conducted a brief physical

examination; he then administered aspirin and nitroglycerin and took Zhang to the clinic.  (Def.

56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.)

At the clinic, Zhang's blood pressure was measured at 150/86.  (Def. 56.1 ¶ 15;

Pl. 56.1 Resp. ¶ 15.)  An EKG was performed, which showed first degree atrioventricular block

and occasional premature ventricular contractions;  Dr. Zaman considered these results

abnormal, but he noted that the results were similar to previous EKGs.  (Def. 56.1 ¶ 15; Pl. 56.1

Resp. ¶ 15.)  Given Zhang's age and risk factors, including his hypertension and hyperlipidemia,

Dr. Zaman recorded that he could not "be sure about the cause of pain without further" workup;

he called 911 and had Zhang transferred to the hospital to rule out "unstabel [sic] angina."  (ECF

284-10 at 23; Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15.)  Zhang was monitored with a cardiac monitor

while waiting for EMS to arrive.  (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15.)

Zhang was transported to Lincoln Hospital's Emergency Department, and he was

admitted on the morning of September 5.  (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 17.)[4]  On intake, his

medical history was recorded as hypertension, hyperlipidemia, and lumbago, and he was noted as

---

[4] Plaintiffs' Rule 56.1 response incorrectly lists defendant's paragraph 16 as paragraph 17—the numbering of paragraphs above 15 is therefore inconsistent.

showing no signs of physical distress. (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 17.) He was kept "hooked continuously to [a] portable cardiac monitor" which showed a "normal sinus rhythm." (ECF 284-10 at 58–59.) Several diagnostic tests were performed; his records indicate that "serial EKGs" showed normal sinus rhythms, chest x-rays showed "no acute changes," and "serial cardiac enz[ymes]" were negative. (ECF 284-10 at 63–65.) He was discharged at around 10:35 p.m. in stable condition, prescribed aspirin, and told to follow up with his primary care physician. (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 17.) He was also told to return to the ER if he experienced dizziness, nausea, shortness of breath, numbness, chest pain, abdominal pain, or numbness/weakness in his extremities. (ECF 284-10 at 64; Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 17.)

Upon Zhang's return to Rikers he was assessed by a nurse practitioner, who recorded that the two "cardiac enzymes" and two EKGs performed at the hospital were negative and that he had been treated with ibuprofen. (Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 18.) Zhang reported through a Mandarin interpreter that he was still experiencing pain in the left upper quadrant of his back that was "constant, achy and 4/10." (ECF 284-5 at 64; Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 18.) Zhang denied "any [shortness of breath], trauma, lifting, pulling, numbness, tingling or paresthesia of extremities." (ECF 284-5 at 64; Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 18.) Zhang was instructed on diet and exercise, and he "verbalized" that he understood; he was told to follow up within a few days. (ECF 284-5 at 65; Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 18.)

Defendants' Inmate Death Review Annual Report later found that upon Zhang's return from the hospital, or in a "subsequent chronic care encounter[]," he should have been referred for a stress test. (ECF 296-8 at 4.)

On September 7, 2015, Zhang presented with a rash on his neck and was prescribed Sarna lotion by a physician assistant. (ECF 284-5 at 62–63; Pl. 56.1 ¶ 20; Def. 56.1

Resp. ¶ 20.)  His blood pressure was measured at 144/86, and he was again prescribed Norvasc for his hypertension.  (ECF 284-5 at 61–62.)

Also on September 7, Zhang met with a nurse practitioner for a follow-up on his hospital visit.  (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 19.)  After his vitals were taken and a physical exam performed, Zhang—via translator—again denied "any chest pain, [shortness of breath], numbness, tingling, paresthesia [or] any other problem."  (ECF 284-5 at 58; Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 19.)  The nurse practitioner recorded that "no further treatment" was needed for Zhang's chest pain.  (ECF 284-5 at 58; Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 19.)

On September 13, 2015, Zhang presented in the clinic complaining that he had been experiencing dizziness and lightheadedness since the day prior, and these conditions were exacerbated by standing up and laying down.  (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 20.)  He was diagnosed with vertigo and prescribed meclizine.  (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 20.)  His blood pressure was recorded at 159/87; he was given a "stat" dose of Norvasc that day, and he was additionally prescribed hydrochlorothiazide for his hypertension.  (ECF 284-5 at 55–57; Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 20.)  The record of this appointment does not indicate whether a Chinese interpreter was used.   (ECF 284-5 at 56–57; Pl. 56.1 ¶ 22; Def. 56.1 Resp. ¶ 22.)

Zhang's hydrochlorothiazide prescription was refilled on October 12, 2015.  (ECF 284-5 at 54.)  His aspirin prescription was refilled on October 18, 2015.  (Def. 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 21.)

Zhang's Zocor prescription was refilled on November 6, 2015; the nurse practitioner also ordered a follow-up lipid screen because Zhang was assessed as "coronary risk 1."  (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 23.)  The results showed elevated cholesterol levels and he was called back into the clinic for further assessment.  (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 25.)  His

vital signs and physical examination were normal.  (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 25.)  His

Zocor prescription dosage was increased from 10 mg to 20 mg, and a follow-up lipid screen was

ordered for February 13, 2016.  (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 25.)  Zhang was again

advised—via translator—as to diet, exercise, and taking his medication.  (ECF 284-5 at 47; Def.

56.1 ¶ 24; Pl. 56.1 Resp. ¶ 25.)

 Zhang had his Norvasc prescription renewed for 90 days on December 4, 2015.

(Def. 56.1 ¶ 25; Pl. 56.1 Resp. ¶ 26.)  His hydrochlorothiazide prescription was renewed for 90

days on January 8, 2015.  (Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 27.)

 On January 14, 2016, Zhang was seen in the clinic for "noncompliance" with his

blood pressure and cholesterol medications.  (ECF 284-5 at 41.)  At this appointment, his blood

pressure was measured at 119/68, and his hypertension was assessed as "well controlled."  (ECF

284-5 at 42.)  Zhang was "counseled" on "compliance with meds."  (ECF 284-5 at 41–42.)  The

record of this appointment does not indicate whether a Chinese interpreter was used.  (ECF 284-

5 at 41–42.)

 Zhang's aspirin prescription was renewed for 90 days on January 15, 2016, and

his Zocor prescription was renewed for 60 days on February 9, 2016.  (Def. 56.1 ¶¶ 28, 30; Pl.

56.1 Resp. ¶¶ 29, 31.)

 On February 15, 2016, Zhang went to the clinic reportedly complaining of left

shoulder pain, and he was seen by Dr. Nnaemezie Umeasor.  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶

33.)  Zhang relayed through an interpreter that he had been experiencing pain in his shoulder for

four weeks.  (ECF 284-5 at 33; Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 33.)  Zhang's vitals were taken,

and his blood pressure was recorded as 121/85.  (ECF 284-5 at 33.)  Dr. Umeasor examined Mr.

Zhang and observed that he could not raise his left arm higher than shoulder-level and that he

had tenderness in his left shoulder; Zhang reportedly pointed to an area of the left shoulder near the supraspinatus muscle.  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 33.)  Based on the duration of the shoulder pain and the physical examination, Dr. Umeasor diagnosed Zhang with rotator cuff syndrome in his left shoulder.  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 33.)  He prescribed ibuprofen and Robaxin—a muscle relaxer—and he referred Zhang for physical therapy.  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 33.)

On February 22, 2016, Zhang came back to the clinic, this time reportedly complaining of pain in his left hand, and he was seen—with the assistance of a Chinese interpreter—by Dr. Jane Sanjose.  (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 34.)  His vital signs were normal, and his blood pressure was recorded as 120/71.  (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 34.)  Through the translator, Zhang reported that he had experienced pain in his left hand for two years, and that he had previously been given an injection in China each time the pain occurred.  (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 34.)  Dr. Sanjose determined that Zhang had a full range of motion in his left hand, arm, and shoulder; she suspected he might be suffering from arthritis, but—despite the assistance of the interpreter—she was unable to get a precise explanation from Zhang about his prior hand problems, and her assessment was "pain in the joint unspecified."  (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 34.)  Dr. Sanjose advised Mr. Zhang through the interpreter that he had a pending physical therapy consult.  (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 34.)

On February 29, 2016, Zhang's Norvasc was renewed for 90 days.  (Def. 56.1 ¶ 34; Pl. 56.1 Resp. ¶ 35.)

On March 8, 2016, Zhang returned to the clinic, again complaining of shoulder pain, and he was seen—via interpreter—by physician assistant Chika Nwogwugwu.  (Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 41.)  Zhang reported that his medication was not working and that his

shoulder pain still recurred off and on.  (ECF 284-5 at 27; Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 41.)

Nwogwugwu observed that Mr. Zhang had a reduced range of motion in his left shoulder,

displayed point tenderness, and had spasms in the mid-shoulder area.  (ECF 284-5 at 28; Def.

56.1 ¶ 40; Pl. 56.1 Resp. ¶ 41.)  The records of this appointment show Zhang was diagnosed with

"Shoulder Bursitis/Tendonitis."  (ECF 284-5 at 28.)  A left shoulder x-ray was ordered, and

Zhang was given doses of Robaxin and ibuprofen; Zhang was also advised that he had a physical

therapy appointment scheduled for March 10, 2016.  (Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 41.)  The

results of the x-ray showed mild degenerative disease of the shoulder.  (Def. 56.1 ¶ 41; Pl. 56.1

Resp. ¶ 42.)

On March 10, 2016, Zhang met with physical therapist Christina Pillora.  (Def.

56.1 ¶ 42; Pl. 56.1 Resp. ¶ 43.)  The appointment was conducted with the assistance of a

Mandarin interpreter, but Pillora noted that "the patient was using a different kind of chinese

language," and while Zhang "had tried to converse with the mandarin interpreter," she stated that

"not much information was taken because of the language barrier."  (ECF 284-5 at 25.)  She also

reported that "there was no known available interpreter for his language."  (ECF 284-5 at 25.)

Despite the translation difficulties, Pillora understood that Zhang's shoulder pain had begun in

January 2016 without any known cause.  (Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 43.)  Zhang

communicated that a few years prior he had experienced a problem with his foot and had

received an injection—he wanted to get the same injection in his shoulder because he believed

that might make it better.  (ECF 284-5 at 25; Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 43.)  Pillora noted

Zhang's history of hypertension and observed that his shoulder had a limited range of motion

and was tender.  (ECF 284-5 at 25; Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 43.)  Pillora arranged a plan

of care where Zhang would be seen once a week for 15 weeks, and she provided home exercises

14

for Zhang to do.  (ECF 284-5 at 25; Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 43.)  Zhang expressed his clear preference for an injection over the exercises; Pillora noted she was having trouble convincing him of the importance of the exercises, a difficulty that was exacerbated by the language barrier.  (ECF 284-5 at 25; Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 43.)  A follow-up was scheduled for the next week.  (ECF 284-5 at 25; Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 43.)

On March 14, 2016, Zhang had an appointment to follow-up on his hypertension. (Def. 56.1 ¶ 43; Pl. 56.1 Resp. ¶ 44.)  The physician assistant recorded that Zhang "speaks [M]andarin" and that he was seen with the assistance of a translator.  (ECF 284-5 at 22.)  The record of this appointment indicates that Zhang stated that he "does not have" hypertension and he "will not take any medication."  (ECF 284-5 at 22.)  Zhang was recorded as refusing to take Norvasc, and self-reporting that he "rarely take[s]" it.  (ECF 284-5 at 22.)  His blood pressure was recorded as 130/89.  (ECF 284-5 at 23.)  The risks associated with discontinuing the medication were reportedly explained to Zhang through the interpreter.  (ECF 284-5 at 23)  The record also indicates that Zhang was refusing to take his Zocor—despite his LDL reportedly being 160—and the risks associated with discontinuing that medication were also relayed through the interpreter.  (ECF 284-5 at 24.)  He signed a refusal form for both medications; this form, which is written in English, includes a signed declaration from the physician assistant that it was explained to Zhang the risks "of having a heart attack" by discontinuing the medication. (ECF 284-5 at 129.)  The form is not signed by the translator, despite there being a line for a translator affirmation.[5]  (ECF 284-5 at 130.)  Zhang was counseled regarding a low-salt diet, a low-fat diet, and exercise.  (ECF 284-5 at 23–24.)  He was also referred to Optometry for an eyeglasses request.  (ECF 284-5 at 23.)

---

[5] The translation services used during Zhang's clinic visits were telephonic.

On March 17, 2016, Zhang also refused physical therapy, and he was recorded as refusing to sign a refusal form.  (ECF 284-5 at 21, 128; Def. 56.1 ¶ 44; Pl. 56.1 Resp. ¶ 45.)  On March 24, 2016, Zhang again refused physical therapy, and again refused to sign the refusal form—this time Zhang communicated that he was refusing to sign the form because he did not understand what was written on it.  (ECF 284-5 at 20; Def. 56.1 ¶ 45; Pl. 56.1 Resp. ¶ 46.)  Noting that Zhang had twice refused—and had consistently shown disapproval of—physical therapy, Pillora determined there was no need to schedule further appointments.  (ECF 284-5 at 20; Def. 56.1 ¶ 45; Pl. 56.1 Resp. ¶ 46.)  The records do not indicate whether an interpreter was used at this appointment.  (Pl. 56.1 ¶ 44; Def. 56.1 Resp. ¶ 44.)  Zhang also had an optometry appointment that same day.  (Def. 56.1 ¶ 46; Pl. 56.1 Resp. ¶ 47.)

Near the end of February 2016, Zhang met Juan Requena, another detainee in his housing unit.  (Def. 56.1 ¶ 35; Pl. 56.1 Resp. ¶ 36.)  Requena could not understand Zhang because he did not speak Chinese, but he recounted at a deposition that when they first met, Zhang "started complaining about his arm," pointed to the area "in between his arm and chest," and repeatedly said "injection."  (ECF 284-14 at 13–15.)  Thereafter, Zhang frequently complained about to him about "chest pain" and expressed his negative opinion regarding the treatment he was receiving.  (Pl. 56.1 ¶¶ 84, 87; Def. 56.1 Resp. ¶¶ 84, 87.)  Requena recounted that he repeatedly helped Zhang sign up for sick calls so that he could go to the clinic.  (Def. 56.1 ¶ 36; Pl. 56.1 Resp. ¶ 37.)  He estimated that he helped Zhang sign up for the clinic between five and ten times, and that each time Zhang signed up for the clinic, he was able to go.  (ECF 284-14 at 67–68.)  He was not present for any interaction Zhang had with medical staff.  (ECF 284-14 at 78.)

Requena also slept next to Zhang and observed that Zhang would sometimes moan during the night, and on at least one occasion he observed Zhang crying in the night.  (ECF 284-14 at 31; Pl. 56.1 ¶ 89; Def. 56.1 Resp. ¶ 89.)  Around the time of Zhang's physical therapy consult, Requena arranged for Zhang to speak with a Chinese-speaking correction officer, who relayed to Requena that Zhang had previously received an injection for his chest pain; Requena states that he told the correction officer that Zhang's pain was in the heart, or between the heart and the arm.  (ECF 284-14 at 76–80; Pl. 56.1 ¶ 88; Def. 56.1 Resp. ¶ 88)  At another unspecified point, Requena told Zhang that ibuprofen and Tylenol were "no good, because of the liver," and Requena stated that Zhang ultimately stopped taking the ibuprofen he was prescribed.  (ECF 284-14 at 45:13–18; Def. 56.1 ¶ 38; Pl. 56.1 Resp. ¶ 39.)  Requena stated he was moved out of Zhang's dorm sometime in late March.  (ECF 284-14 at 30.)

On April 5, 2016, Zhang's Zocor prescription was renewed for 60 days.  (Def. 56.1 ¶ 47; Pl. 56.1 Resp. ¶ 48.)  On April 12, 2016, he was given a new aspirin prescription for 90 days.  (Def. 56.1 ¶ 48; Pl. 56.1 Resp. ¶ 49.)  This was Zhang's last recorded non-emergency interaction with medical personnel.  According to the record of this renewal, his "current medications" were listed as aspirin and Norvasc for hypertension and Zocor for his hyperlipidemia.  (ECF 284-5 at 17.)

On the afternoon of April 18, 2016, correction officers heard a loud thud from the dayroom in Zhang's housing unit, and they called the medical clinic.  (Def. 56.1 ¶ 49; Pl. 56.1 Resp. ¶ 50.)  One officer entered the dayroom and observed Zhang seizing and shaking; when the seizing stopped, the officer placed Zhang on his side in the "recovery position."  (Def. 56.1 ¶ 49; Pl. 56.1 Resp. ¶ 50.)  The officer saw that Zhang had stopped breathing and began CPR chest compressions, while a detainee began mouth-to-mouth resuscitation.  (Def. 56.1 ¶ 49; Pl. 56.1

Resp. ¶ 50.)  Shortly thereafter, medical personnel arrived; they determined that Zhang had no pulse and was not breathing.  (Def. 56.1 ¶ 50; Pl. 56.1 Resp. ¶ 51.)  They connected Zhang to a defibrillator and provided him oxygen through an Ambubag while CPR continued; EMS was called.  (Def. 56.1 ¶ 50; Pl. 56.1 Resp. ¶ 51.)  After administration of CPR did not return a pulse, Zhang was shocked multiple times with the defibrillator, was administered epinephrine intravenously, and was given additional CPR.  (Def. 56.1 ¶ 50; Pl. 56.1 Resp. ¶ 51.)  The efforts to revive Zhang were unsuccessful, and he was pronounced dead at 3:09 p.m. after 36 minutes of attempted resuscitation.  (Def. 56.1 ¶ 50; Pl. 56.1 Resp. ¶ 51.)

An autopsy revealed that Zhang suffered from "hypertensive and atherosclerotic cardiovascular disease."  It was determined his cause of death was natural and due to this disease.  (Def. 56.1 ¶ 51; Pl. 56.1 Resp. ¶ 52.)

II.     Procedural History

Plaintiffs filed their original complaint on July 17, 2017.  (ECF 1.)  The complaint named as defendants: the City of New York, NYDOC, Rikers Island Facilities, NYCHHC, Corizon, Mayor Bill de Blasio, Commissioner Joseph Ponte, NYCHHC President Ram Raju, NYCHHC Senior Vice President Patsy Yang, and Corizon CEO Karey Witty.  The complaint also listed three sets of unnamed defendants: (1) NYC Corrections Officers John and Janes Does 1–10; (2) NYCHHC Employees John and Jane Does 11–20 ("NYCHHC Does"); and (3) Corizon Employees John and Jane Does 21–30 ("Corizon Does").

The complaint alleged eight causes of action: (1) a variety of constitutional claims under 42 U.S.C. § 1983, as well as New York state constitutional claims; (2) wrongful death; (3) loss of society, services, and parental guidance; (4) claims under the Rehabilitation Act of 1973 and of the Americans with Disabilities Act; (5) negligence and malpractice; (6) negligent

supervision; (7) infliction of intentional and negligent emotional distress; and (8) fraudulent concealment.

Judge Keenan issued a case management order on October 3, 2017, setting the close of discovery for April 30, 2018.  (ECF 33.)  Discovery relating to the <u>Monell</u> portion of plaintiffs' section 1983 claims was subsequently stayed by Magistrate Judge Wang pending resolution of the underlying individual claims.  (ECF 118.)  The discovery deadline regarding the underlying claims was extended to September 28, 2018, with exceptions made for a few depositions scheduled during October 2018.  (ECF 166.)

On June 28, 2018, Judge Keenan on a motion under Rule 12(b)(6), Fed. R. Civ. P., dismissed all claims except for the (1) section 1983 deliberate indifference claim against the Municipal Defendants, NYCHHC Does 11–20, and Corizon Does 21–30, (2) the wrongful death claim, and (3) the negligence and malpractice claim.  (ECF 126.)  Plaintiffs sought leave to amend to reinstate certain dismissed claims, but Judge Keenan denied the motion.  (ECF 171, 198.)  Plaintiffs filed a motion for reconsideration of the denial of leave to amend, which was also denied.  (ECF 213, 233.)

Plaintiffs filed a notice of appeal from the orders granting in part the motion to dismiss, denying leave to amend, and denying the motion for reconsideration.  (ECF 235.)  Plaintiffs withdrew this appeal on December 3, 2020, but the appeal was reinstated on June 1, 2021.  (ECF 247, 253.)  In February 2022, the Second Circuit dismissed the appeal for lack of jurisdiction as there was no final, appealable order as required by 28 U.S.C. § 1291.  (ECF 254.)

The case was reassigned to the undersigned on September 7, 2022.  The Court set a schedule for final pretrial submissions and a final pretrial conference.  Defendants requested a briefing schedule for a proposed motion for summary judgment.  (ECF 255, 257.)  In response,

on October 7, 2022, almost four years after the close of discovery, plaintiffs moved for leave to amend the Complaint to add 32 individuals as defendants in place of NYCHHC Does 11–20 and Corizon Does 21–30.  (ECF 263.)  The Court denied the request as untimely and futile.  (Opinion and Order of 12/22/2022 (ECF 273).)

Defendants have moved for summary judgment on all remaining claims.  (ECF 283.)  Plaintiffs have filed an opposition to summary judgment and a cross-motion in limine to exclude the report and affidavit of defendants' expert.  (ECF 295–97.)  Defendants have filed motions to strike portions of certain affidavits submitted by plaintiffs and to preclude the affirmation of plaintiffs' expert.  (ECF 313–16.)

DISCUSSION

I.    Summary Judgment Standard.

"The role of the district court on summary judgment is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  McKinney v. City of Middletown, 49 F.4th 730, 738 (2d Cir. 2022) (quotation marks omitted).  Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A genuine factual dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Truitt v. Salisbury Bank & Tr. Co., 52 F.4th 80, 85 (2d Cir. 2022) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable

inferences against the movant." <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." <u>Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.</u>, 575 F.3d 199, 204 (2d Cir. 2009). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir. 2004) (quoting <u>Aslanidis v. U.S. Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" <u>Allen v. Coughlin</u>, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

II.     **The Doe Defendants, NYDOC, and Rikers Island Will be Dismissed as Defendants.**

As an initial matter, the Complaint brings claims against Rikers medical staff identified only as NYCHHC Does 11–20 and Corizon Does 21–30. The Complaint alleges that Corizon was a corporate entity that contracted to "provide health and medical services" to detainees at Rikers Island through the end of 2015, and that NYCHHC, a municipal agency, stepped into this role in 2016. (Compl. ¶¶ 43–45, 50–53.) NYCHHC Does 11–20 and Corizon Does 21–30 correspond to the unnamed members of the medical staff during the relevant periods. Without challenge from defendants, the Court assumes for the purpose of this motion

that all Does employed by NYCHHC or by Corizon were persons acting under color of state law while Zhang was in their care.

Discovery has long closed, and plaintiffs failed to join any named individual defendants.  As discussed in the Court's Order of December 22, 2022, any further attempt to do so would be both untimely and futile.  All claims against both sets of Doe defendants will therefore be dismissed.[6]  The allegations against the Doe defendants, however, are still relevant because it is plaintiffs' burden to prove that a person acting under color of state law deprived Zhang of a right protected under the Fourteenth Amendment.  The allegations against the Doe defendants informs the Court's analysis.

Additionally, the claims against "Rikers Island Facilities" and NYDOC will be dismissed.  Neither of these defendants are suable entities—claims ostensibly brought against them must be instead brought against the City of New York.  See Adams v. Galletta, 966 F. Supp. 210, 212 (S.D.N.Y. 1997); Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007).[7]

---

[6] Failure to join specific named individuals in lieu of Doe defendants within the limitations period provides a basis for dismissal.  Tapia–Ortiz v. Doe, 171 F.3d 150, 151–152 (2d. Cir.1999) (per curiam). The Court's Opinion and Order denying leave to amend to join 32 individuals as defendants was denied in part because the claims against the individuals would be time-barred under the three-years limitation period.  (Opinion and Order of 12/22/2022 (ECF 273) at 6.)

[7] The Court also rejects plaintiffs' attempts to expand the remaining claims. In their memorandum of law in opposition to summary judgment, plaintiffs characterize their claims against the remaining Municipal Defendants as reaching the treatment Zhang received when he was treated off-site at Lincoln Hospital.  Defendants object that Lincoln Hospital is not a party to this action.  Plaintiffs acknowledge that Lincoln Hospital is not an entity they have sued or might sue in this matter, but they argue it is not an "outside hospital" because it is operated by defendant NYCHHC; therefore, they urge, any conduct taken by personnel at Lincoln Hospital is encompassed by the existing claims against NYCHHC.  The Court rejects this theory.  Lincoln Hospital is not mentioned in the Complaint, which instead is directed at the care Zhang received at Rikers and alleges that Zhang was never sent to a hospital at all.  NYCHHC is named as a defendant in reference to "its duty and obligation to provide health and medical services to inmates of the RIKERS ISLAND."  (Compl. ¶ 45.)  Additionally, it is not at all timely to first press this theory in an opposition to summary judgment more than four years after the close of discovery, discovery that was conducted without any claim against or mentioning Lincoln Hospital.  Even at that, plaintiffs have not pointed to a person or persons at Lincoln Hospital who were deliberately indifferent to his medical need.

III.    The Court Will Grant Defendants' Motion for Summary
        Judgment on the Deliberate Indifference Claim.

"[T]he standard for claims alleging failure to provide medical treatment" to a

prisoner is "'deliberate indifference to serious medical needs.'" Ziglar v. Abbasi, 582 U.S. 120

148 (2017) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  While a convicted prisoner's

claim for deliberate indifference is evaluated under the Eighth Amendment, similar protections

have been extended "to civil detainees under the Due Process Clause of the Fourteenth

Amendment," on the grounds "that persons in civil detention deserve at least as much protection

as those who are criminally incarcerated."  Charles v. Orange Cnty., 925 F.3d 73, 82 (2d Cir.

2019) (citing Youngberg v. Romeo, 457 U.S. 307, 321–22 (1982)).

"[T]o establish a claim for deliberate indifference to conditions of confinement

under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove

that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed

to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee

even though the defendant-official knew, or should have known, that the condition posed an

excessive risk to health or safety."  Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017) (citing

Kingsley v. Henrickson, 576 U.S. 389, 396–99 (2015)).  The concept of deliberate indifference

as elucidated in Darnell applies to a claim for deliberate indifference to a medical need.  Charles,

925 F.3d at 87.[8]  To succeed on their claim plaintiffs must therefore first show that (1) Zhang

had "a serious medical need," and (2) an individual official acted with deliberate indifference to

such need.  Id. at 86.

---

[8] Because deliberate indifference to the medical needs of a pretrial detainee inherently shocks the conscience, "[a]
court need not . . . therefore, conduct a separate analysis, over and above the deliberate indifference analysis, of
whether the state's conduct 'shocks the conscience'."  Charles, 925 F.3d at 86.

To determine whether a deprivation is "objectively serious," a court first asks whether the detainee "was actually deprived of adequate medical care."  Salahuddin v. Goord, 467 F.3d 263, 279 (2d. Cir. 2006).  The requirement for adequate care simply means there is a duty to "provide reasonable care," not any and all possible care.  Id. (citing Farmer v. Brennan, 511 U.S. 825, 844–47 (1994)).  There is evidence in the record that the administration of a cardiac stress test may have led to other diagnostic procedures, which, in turn, may have led to corrective measures for Zhang's cardiovascular disease.  The Court assumes for the purpose of its analysis that this satisfies the "objectively serious" prong.

But even if the deprivation was "objectively serious," to demonstrate deliberate indifference "[a] plaintiff must show 'something more than mere negligence.'"  Charles, 925 F.3d at 87 (quoting Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)).  A detainee can show "either that the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." Id. (emphasis in original).  Such conduct "'involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm.'" Id. (quoting Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000)).

As noted, there is no individual defendant named in the action and discovery on the pending Monell claim is stayed to determine whether there is an underlying constitutional violation.  But for the Monell claim to survive, the plaintiffs must show that Zhang "has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible."  Askins v. Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013).  "Monell does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy,

regardless of whether he suffered the infliction of a tort resulting from the policy." Id.  There is no requirement that plaintiffs sue the individual actors who deprived them of a right protected by the constitution for a Monell claim to be viable, id., but there must have been a constitutional violation by a person acting under color of state law employed by the municipality.

Plaintiffs must show that a member of the Rikers medical staff was deliberately indifferent to Zhang's medical needs, i.e., that one or more members of the medical staff acted, or failed to act, intentionally or with "culpable recklessness," meaning with conscious disregard of a substantial risk of serious harm.  But the thoughts, words, and deeds of one among several actors may not be imputed to any another actor for the purpose of assessing deliberate indifference.  See DiStiso v. Cook, 691 F.3d 226, 246 (2d Cir. 2012) ("[I]mputed knowledge is insufficient as a matter of law to support a claim for deliberate indifference.").  In other words, some one or more individual actors must have been deliberately indifferent.

Plaintiffs evidence is principally offered in a collective manner and does not focus on the thoughts, words, or deeds of individual actors.  They offer the following allegation of deliberate indifference:

> Defendants have admitted that although the Defendants' medical providers or professionals were aware of the decedent's risk factors for cardiac disease, they ultimately determined not to treat the decedent's severe chest pain, which led to the decedent's eventual death caused by the heart attack on April 18, 2016.

(ECF 297 at 22.)

In support of summary judgment, defendants offer record evidence that, in contrast to the allegations made in the Complaint and offered here by plaintiffs, there were only two occasions where Zhang complained of chest pain to the medical staff at Rikers.  When Zhang first complained of chest pain on June 9, 2015, an EKG and chest x-ray were ordered.

The results were normal, and he was diagnosed with pleuritis and costochondritis.  He presented with chest pain a second time on September 5, 2015.  He was sent to the hospital for elevated care and to rule out cardiac issues.  On both these occasions, the only two occasions where records show medical staff understood Zhang to describe chest pain, those staff members took the complaints seriously.  In response, plaintiffs offer evidence that on other occasions Zhang mentioned chest pain to his children or another detainee.  But complaints made to friends and family do not indicate awareness by the medical staff.

   The medical records covering the period following the September 5 hospitalization do not reflect complaints of chest pain by Zhang to any named member of the Rikers medical staff.  In response to defendants pointing to the absence of such evidence, plaintiffs have not come forward with any admissible evidence that any member of the medical staff understood Zhang to being making a complaint of chest pain.  Plaintiffs make much of the fact that Zhang complained of pain in his left shoulder and left hand, and they assert that these were suggestive of pain associated with a cardiac condition.  But as the defendants' expert points out, angina or pain associated with a cardiac condition is transient, and Zhang reported that he had symptoms for two years thereby ruling them out as cardiac related.  (ECF 284-3.)  At various times, Rikers' staff treated Zhang's shoulder, hand, or back pain, with Robaxin, ibuprofen, and menthol-methyl salicylate ointment, and they ultimately sent him for a physical therapy consult.  A March 8, 2016 x-ray of Zhang's left shoulder showed mild degenerative disease of the shoulder.  (ECF 284-3 at 7.)  None of this bespeaks of intentionality or culpable recklessness.

   As to his diagnosed risk factors for cardiac disease—hypertension and hyperlipidemia—the records show he was treated for both conditions.  He was prescribed Norvasc for his hypertension, which improved to the point where it was assessed as "well-

controlled." He was prescribed Zocor for his hyperlipidemia, and the dosage was increased from 10 mg to 20 mg in response to follow-up monitoring. Plaintiffs have not come forward with admissible evidence rebutting these facts. While these treatments did not prevent Zhang's death, they do not demonstrate deliberate indifference to, or conscious disregard of, his complaints or his diagnosed conditions.

Plaintiffs generally dispute the accuracy of the medical information in Zhang's medical records because there is no evidence of the presence of an interpreter or translator fluent in Wenzhou, the dialect of Chinese spoken by Zhang. But, as noted above, the records reflect that the medical staff was usually able to obtain basic information from Zhang about his presenting complaint with a Mandarin interpreter, through a fellow inmate, or by other verbal or non-verbal means. Plaintiff can point to no evidence that any particular member of the medical staff was deliberately indifferent to Zhang's medical needs on this basis.

Plaintiffs have also submitted declarations from Man Zhang and Chunman Zhang, Zhang's sons. (ECF 296-14, -16.) These declarations contain assertions about what the sons were told by Zhang about his medical conditions and his assessment of the treatment he was receiving. Plaintiffs also submit an affirmation from their expert witness, Dr. David A. Hess, which is based in part on statements made in the sons' declarations. (ECF 296-15.) Defendants object to the much of the content in the declarations as contradicted by prior deposition testimony and inadmissible on hearsay grounds. The also move to strike Dr. Hess's affirmation as an improper expansion, long after the close of discovery, of his previous expert report, and they object to Dr. Hess's reliance on the declarations.

For the purposes of this motion, the Court need not rule on the admissibility of this evidence because even were the Court to accept these submissions in their entirety, they

27

would not affect the deliberate indifference analysis.  Zhang's description of his medical
conditions and expression of dissatisfaction with his treatment to his sons does not indicate
awareness of those statements by medical staff.  The declarations do not point to any particular
member of the medical staff who was aware that Zhang was suffering from an acute but
untreated coronary condition.  They do not show that one or more members of the medical staff
was aware that Zhang was experiencing chest pain and intentionally or recklessly failed to
respond to it.

    Additionally, Dr. Hess's central criticism of Rikers medical staff is precisely that
they were <u>unaware</u> of the relevant risks because as a matter of course they failed to fully review
Zhang's medical history, which would have shown the previous complaints of chest pain.  (ECF
296-12 at 8.)  He concludes that possible early manifestation of his coronary artery disease "was
not recognized" by staff treating Zhang for complaints of shoulder pain.  (ECF 296-12 at 9.)
While these criticisms might be relevant to a claim for medical malpractice, they do not point to
medical staff being aware of, but consciously disregarding, Zhang's condition.  (See ECF 296-12
at 21.)  These submissions do not raise a disputed triable issue of fact as to deliberate
indifference.[9]

    A reasonable jury could not conclude on this record that one or more members of
the medical staff—assessing the actions of an individual actor in the context of the information
available to that individual—was deliberately indifferent to a serious medical need of Zhang.

---

[9] Plaintiffs' have also filed a motion <u>in limine</u> to exclude the expert report and affidavit from defendants' expert Dr.
Stanley J. Schneller.  (ECF 295.)  The basis for this motion is that Dr. Schneller opined in his report that "there is no
evidence in the record of any deliberate indifference."  (ECF 297 at 26.)  Plaintiffs argue this was a legal conclusion,
rather than expert medical testimony, and they request that on this basis (1) the entire report be excluded from
consideration, and (2) Dr. Schneller be precluded from testifying at any subsequent trial.  While the Court would not
allow an expert witness to offer improper legal opinions at trial, the Court does not rely on Dr. Schneller's opinion
regarding deliberate indifference in the above analysis.  The requested relief is unnecessary at this stage of the
proceedings.  The Court will deny the motion.

Neither negligence nor medical malpractice, individually or collectively, are sufficient to demonstrate that a detainee has been deprived of a right protected by the Fourteenth Amendment.  In the absence of an underlying "independent constitutional violation," the Monell claim against the remaining Municipal Defendants must be dismissed.  Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006).

IV.   The Court Will Decline to Exercise Supplemental
Jurisdiction Over Plaintiffs' State Law Claims.

Defendants opening brief requests that, if the Court does not outright dismiss the state law claims, it should decline to exercise supplemental jurisdiction over them.  Plaintiffs' submissions make no response to this request.

Having concluded that no federal claim survives summary judgment, the Court will decline to exercise supplemental jurisdiction over the state law claims.  See 28 U.S.C. § 1367(c)(3) (district courts "may decline to exercise supplemental jurisdiction over a claim" where "the district court has dismissed all claims over which it has original jurisdiction."). District courts are instructed "that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims.'"  Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (ellipsis omitted) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).  The relevant factors are "the traditional 'values of judicial economy, convenience, fairness, and comity.'"  Id. (quoting Cohill, 484 U.S. at 350).  Applying those factors here, the Court concludes that the state law claims, particularly the medical malpractice claim, would benefit from "special state court expertise" and "would be better decided in state court."  Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 86 (2d Cir. 2018).

CONCLUSION

   The claims against defendants NYDOC, Rikers Island Facilities, NYCHHC Does 11–20, and Corizon Does 21–30 are dismissed in their entirety with prejudice.  Defendants' motion for summary judgment is granted in part as to the section 1983 claim.  Plaintiffs' motion in <u>limine</u> to preclude expert testimony of Dr. Schneller is denied, and defendants' motions to preclude the affirmation of Dr. Hess and to strike to declaration of Man and Chunman Zhang are denied as moot.  The Court declines to exercise supplemental jurisdiction over the state law wrongful death, and negligence and medical malpractice claims against the remaining Municipal Defendants, and these claims are dismissed without prejudice.

   The Clerk is respectfully directed to terminate the motions (ECF 283, 295, 313, 315, 317) and close the case.

   SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
   September 28, 2023